Stewart A. WRIGHT, Lori L. Wright, Plaintiffs,

v.

DOW CHEMICAL U.S.A.; Dow Chemical Company; Whitmire Research Laboratories; Southern Mill Creek Products Company; Univar Corporation; Van Waters & Rogers, Inc.; Nor–Am Chemical Company, Defendants.

No. 3:92–0125.

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 8, 1993.

David Randolph Smith, Nashville, TN, for plaintiffs.

Thomas I. Carlton, Nashville, TN, for defendants.

### MEMORANDUM

JOHN T. NIXON, Chief Judge.

Pending before the Court in the above-styled case are Defendants'[1] Motions for Summary Judgment (Doc. Nos. 18, 21, 22, 23). Defendants assert that all of plaintiffs' claims relate to inadequate labeling or failure to warn and thus should be dismissed because such claims are barred as a matter of federal law. Defendant Southern Mill Creek Products Company further contends that there are no genuine issues of material fact and that the company is entitled to judgment as a matter of law. For the reasons stated below, the Court grants the motions for summary judgment with respect to plaintiffs' claims of defective marketing and failure to warn. Plaintiffs' non-labeling claims, however, are not dismissed.

### I. BACKGROUND

On February 4, 1992, plaintiffs Stewart and Lori Wright filed this action against the Defendants for legal and equitable relief for personal injuries sustained from pesticide poisoning. The case at bar is a diversity action seeking damages under Tennessee common law and pursuant to the Tennessee Products Liability Act of 1978, Tennessee Code Annotated Sections 29–28–101 to –108. Plaintiffs state three grounds for this action: (i) strict products liability, (ii) negligence and gross negligence, and (iii) breach of implied warranty of merchantability.

The Wrights allege, in their first count, that defendants' pesticides were unreasonably dangerous and in a defective condition

---

1. Pursuant to Rule 41 of the Federal Rules of Civil Procedure, Plaintiffs voluntarily dismissed without prejudice Defendants Univar Corporation and its subsidiary corporation, Van Waters & Rogers.

because of defective marketing and inadequate direct warnings to consumers. Further, plaintiffs claim that the products fail the risk-utility test for defective design because the products' aggregate risks are greater than their aggregate utilities. Plaintiffs contend that under section 402A of the Restatement (Second) of Torts and the Tennessee Products Liability Act, defendants are strictly liable. In their second count, the Wrights allege negligence based on defendants' failure to properly test and study the interactive effects of the pesticides, especially when used over an extended period of time. Plaintiffs also allege that defendants were negligent because they failed to warn consumers and users of the products' risks. Plaintiffs' third count alleges that defendants breached the implied warranty of merchantability because the pesticides are not reasonably suited for the purposes intended.

Defendants Dow Chemical U.S.A., Dow Chemical Company, Whitmire Research Laboratories, Southern Mill Creek Products Company, and Nor–Am Chemical Company, manufacture, sell, design, and distribute pesticides. The Wrights allege that they were poisoned and incurred personal injuries from four of defendants' products. From January 1989 through February 8, 1991, a licensed pest control company sprayed defendants' products in the interior, perimeter, and crawl space of plaintiffs' home. The four pesticides at issue are Dursban (designed, manufactured, distributed, and/or sold by Defendants Dow Chemical U.S.A. and the Dow Chemical Company), Dursban Granular (designed, manufactured, sold, and distributed by Southern Mill Creek Products Company), Ficam (designed, manufactured, sold, and distributed by Nor–Am Chemical Company), and Ultraban (designed, manufactured, sold, and distributed by Whitmire Research Laboratories). Dursban, Dursban Granular, and Ultraban are known by the chemical name, "Chlorpyrifos." The chemical name for Ficam is "Bendiocarb."

On February 9, 1991, the Wrights first detected injuries allegedly caused from exposure to the aforementioned pesticides. Plaintiffs' home was sprayed with Dursban on January 7, 1991 and Ficam on January 14, 1991. On February 1, 1991, Mr. Wright worked in the crawl space of his home, an area that was included in the January 7, 1991 spraying. At 1:30 p.m. on February 8, 1991, while Plaintiffs were not at home, the interior of their residence was sprayed with Ultraban. Allegedly, the Wrights returned to their home at 5:30 p.m. and upon leaving at 6:30 p.m. opened the windows of their home.

Mr. and Ms. Wright returned to their home during the early morning of February 9, 1991 and went to bed. Ms. Wright alleges that at approximately 5:00 a.m. she observed that Mr. Wright was experiencing difficulty breathing. Within five to six minutes, he had a seizure. Paramedics took Mr. Wright to the hospital, where he underwent neurological testing until his release on February 12, 1991. Mr. Wright was released from the hospital with the diagnosis "seizure of unknown etiology." No blood was withdrawn from Mr. Wright until February 13, 1991. Plaintiffs state that subsequent neurological testing revealed that Mr. Wright suffered a seizure as a direct result of pesticide poisoning.

Mr. Wright had a seizure subsequent to the February 9, 1991 incident. The toxicologist who re-evaluated Mr. Wright concluded that Plaintiff is, and will be neurologically impaired, in most probability for the remainder of his life. Mr. Wright alleges that he is no longer employed as a commercial airline pilot as a result of his impairment.

Later in the day on February 9, 1991, Ms. Wright allegedly experienced headaches, blurred vision, muscle aches, running and itchy eyes, sore throat, tingling and numbness in the face, and blotchy skin. On that same day, Ms. Wright was treated at a hospital emergency room and discharged with the diagnosis "possible allergic reaction to insecticide." Ms. Wright alleges that these symptoms persisted, to a lesser degree, each time she entered her home, until the house carpets and upholstered furniture were professionally cleaned on February 21, 1991.

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in part, that summary judgment "shall be rendered forthwith

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." An alleged factual dispute existing between the parties is not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law involved in the case will underscore which facts are material and only disputes over outcome determinative facts will bar a grant of summary judgment. *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510.

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim, particularly when that party has had an opportunity to conduct discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). It is true, however, that "[i]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962) (citations omitted).

To determine if a summary judgment motion should be granted, the court should use the standard it would apply to a motion for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The court must determine that a reasonable jury would be unable to return a verdict for the non-moving party in order to enter summary judgment. *Id.*, 477 U.S. at 249, 106 S.Ct. at 2511. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989) (citations omitted).

## III. DISCUSSION

In construing the evidence in its most favorable light in favor of the party opposing the motions for summary judgment and against the movants, as required under *Bohn Aluminum & Brass Corp.*, 303 F.2d at 427, the Court finds that there does not exist a genuine issue of material fact with respect to the plaintiffs' claims for defective marketing and failure to warn. The Court finds that the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136–136y, ("FIFRA" or the "Act"), expressly precludes the establishment of any state law duties which would impose a labeling requirement in addition to or different from those included in the Act. If plaintiffs prevailed on their claims of defective marketing and failure to warn, a state imposed labeling requirement not included in FIFRA would be established. This additional state regulation is precisely what Congress sought to preclude. Consequently, the plaintiffs' claims of defective marketing and failure to warn are preempted as a matter of law and must be dismissed.

This Court grants the defendants' motions for summary judgment in part. The plaintiffs' claims for defective design, breach of implied warranty of merchantability, and failure to properly test and study the products survive because FIFRA's preemption clause, § 136v(b), is not so broad as to preclude non-labeling claims. Furthermore, with regard to these claims, genuine issues of material fact remain.

The Sixth Circuit has never decided whether FIFRA expressly preempts state law claims for inadequate warnings. However, in *Professional Lawn Care Ass'n v. Village of Milford*, 909 F.2d 929 (6th Cir.1990), *vacated and remanded Village of Milford, Michigan v. Professional Lawn Care Ass'n.*, — U.S. —, 111 S.Ct. 2880, 115 L.Ed.2d 1046 (1991), the Sixth Circuit concluded that FIFRA impliedly preempted Milford, Michigan's ordinance No. 197 which imposed registration, posting, and notice requirements upon commercial "users of pesticides." The Supreme Court vacated the judgment of the Sixth Circuit in *Professional Lawn Care Ass'n* and remanded the case to the circuit

court for further consideration in light of *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). The Supreme Court in *Wisconsin Public Intervenor* held that FIFRA does not preempt local government regulation of pesticide use, but it did not address whether FIFRA preempted state law claims related to labeling.

The federal circuit and district courts remain split on whether FIFRA preempts state law regulation or common-law duties.[2] Notwithstanding the conflict among these courts, the Supreme Court's analysis in *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2612, 120 L.Ed.2d 407 (1992), is instructive. In *Cipollone*, § 5(b) of the Public Health Cigarette Smoking Act of 1969 (the "1969 Cigarette Act") prohibited states from imposing "requirements" on cigarette advertising. The Court held that this prohibition on state regulation preempted common law damage actions arising from claims of inadequate warnings. *Id.* at ——, 112 S.Ct. at 2621.

The case at bar is analogous to *Cipollone*. FIFRA, like the 1969 Cigarette Act, explicitly forbids certain state regulation. Under the standards articulated in *Cipollone*, this Court concludes that FIFRA expressly preempts state law regulation in the area of pesticide labeling.

## A. PREEMPTION

■ The determination whether to grant defendants' motions for summary judgment on the plaintiffs' labeling claims rests on whether FIFRA preempts these claims. Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State law is preempted if: (i) Congress expressly preempts the state law; (ii) Congress has completely supplanted state law in that field; (iii) adherence to both federal and state law is impossible; or (iv) the state law impedes the achievement of the objectives of Congress. *Wisconsin Public Intervenor*, 501 U.S. at ——, 111 S.Ct. at 2481–82.

■ In deciding whether federal law preempts state law, courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (citations omitted). When Congress provides a preemption clause, the presumption against preemption mandates courts to read such a clause narrowly. *See Cipollone*, —— U.S. at ——, 112 S.Ct. at 2608.

■ State law may conflict with a federal regulatory scheme whether the state law takes the form of a statute, a regulation, or common law. A common law duty is just as much a requirement as a state statute, and therefore, such a duty is subject to the same federal preemptive constraints as a state statute. *Cipollone*, at ——, 112 S.Ct. at 2620 (state regulation can be accomplished by an award of damages or by legislative enactment).

2. Cases finding preemption include *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.*, 959 F.2d 158, 164 (10th Cir.1992) [hereinafter *Arkansas–Platte I* ], *vacated and remanded sub nom., Arkansas–Platte & Gulf Partnership v. Dow Chemical*, —— U.S. ——, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992), *on remand*, 981 F.2d 1177 (10th Cir.1993), [hereinafter *Arkansas–Platte II* ], *petition for cert. filed*, (May 10, 1993); *Arkansas–Platte II supra*; *Papas v. Upjohn Co.*, 926 F.2d 1019, 1023 (11th Cir.1991) [hereinafter, *Papas I* ], *cert. granted, judgment vacated, and case remanded sub. nom., Papas v. Zoecon Corp.*, 985 F.2d 516 (11th Cir.1993) [hereinafter, *Papas II* ], *petition for cert. filed*, (June 7, 1993); *Papas II*

*supra; Gibson v. Dow Chemical Co.*, 1992 WL 404681 (E.D.Ky.); *King v. E.I. DuPont Nemours & Co.*, 806 F.Supp. 1030 (D.Me.1992); *Kennan v. Dow Chemical Co.*, 717 F.Supp. 799 (M.D.Fla. 1989); *Fitzgerald v. Mallinckrodt, Inc.*, 681 F.Supp. 404 (E.D.Mich.1987).

Cases holding that FIFRA does not preempt state tort law suits based on labeling include *Ferebee v. Chevron Chemical Company*, 736 F.2d 1529 (D.C.Cir.1984); *MacDonald v. Monsanto*, 813 F.Supp. 1258 (E.D.Tex.1993); *Couture v. Dow Chemical U.S.A.*, 804 F.Supp. 1298 (D.Mon. 1992); *Burke v. Dow*, 797 F.Supp. 1128 (E.D.N.Y.1992).

## B. FIFRA

Congress originally adopted FIFRA in 1947 as a pesticide labeling statute. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991, 104 S.Ct. 2862, 2866–67, 81 L.Ed.2d 815 (1984). In 1972, Congress amended FIFRA and transformed it into a comprehensive system for regulating the distribution and use of pesticides. *Id.* at 991–92, 104 S.Ct. at 2867. The 1972 amendments strengthened the registration and labeling requirements and increased the enforcement authority of the Environmental Protection Agency ("EPA"). 7 U.S.C. §§ 136a, 136f(b), 136t(b), 136u, 136w(a)(1). Before a pesticide can be sold or distributed in the United States, the EPA must register and approve the pesticide. The EPA cannot approve a pesticide unless it conforms to the standards and the EPA labeling regulations established in FIFRA. 7 U.S.C. § 136a(c)(5).

■ In enacting FIFRA, Congress did not intend to occupy the entire field of pesticide regulation. Congress recognized the continuing role of the states in monitoring pesticides covered by the statute:

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

§ 136v(a). Notwithstanding this provision, Congress did preserve for federal law the narrow area of pesticide *labeling* regulation:

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

§ 136v(b). A House Committee report accompanying the 1972 amendments indicates the limits Congress placed on state power in regulating pesticide labeling. "In dividing the responsibility between the States and the Federal Government for the management of an effective pesticide program, the Committee had [sic] adopted language which is intended to completely preempt State authority in regard to labeling and packaging." H.R.Rep. 92–511, 92d Cong., 1st Sess. 16 (1971) *as cited in Papas I.*

Congressional intent that federal law preempt state law in the area of labeling and packaging is also evidenced by FIFRA's broad conception of labeling. Section 136(p) provides, in part:

(1) **Label.**—The term "label" means the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers.

(2) **Labeling.**—The term "labeling" means all label and all other written, printed, or graphic matter—

(A) accompanying the pesticide or device at any time; or

(B) to which reference is made on the label or in literature accompanying the pesticide …

Congress, under the authority of the Supremacy Clause and through FIFRA, explicitly barred state tort remedies for pesticide labeling claims.

## C. APPLICATION OF THE LAW TO THE FACTS

### 1. Labeling Claims

■ The Wrights are precluded from asserting a claim of mislabeling because the product labels in question adhere to the requirements established by the EPA under FIFRA. (Melichar Aff. ¶¶ 3–6; Paul Aff. ¶¶ 3–6). The Wrights rely on *Burke v. Dow*, 797 F.Supp. 1128 (E.D.N.Y.1992) (holding that FIFRA did not preempt state tort law claims based on design defect, negligence, and failure to warn) to oppose defendants' motions for summary judgment. Such reliance is misplaced as the case actually undermines the plaintiffs' ability to assert its labeling claims. The Eastern District of New York, relying on *Cipollone*, in *Burke* stated: "The precise question before the court is whether the plaintiffs' failure to warn claims, if successful, would amount to a state-imposed 'requirement[ ] for labeling or packaging in addition to or different from those required [under FIFRA].'" *Burke* at 1140. The court concluded that if EPA labels were affixed to the products in question, plaintiffs could not claim that the defendants' products were mislabeled.

At the point that the Eastern District of New York attempts to carve out an exception for a state damage action which FIFRA preempts, this Court must disagree with *Burke*. *Burke* further reasoned that the plaintiffs' claims could be salvaged if information "falling generally within the ambit of warnings should have been used when the content of the label was fixed by EPA [sic]." *Id.* at 1140. Congress' broad definition of "label" under FIFRA subsumes the information to which *Burke* refers. By referring to "warnings to the trade" and "other protections," *Burke* attempts to deny that the claim plaintiffs wish to assert is related to labeling. Such a characterization reflects an overly expansive interpretation of FIFRA.

In the case at bar, plaintiffs' assertion of a similar argument is equally flawed. Plaintiffs cannot assert a claim of mislabeling because the products have EPA-approved labels. Once Defendants met the EPA labeling requirements, they fulfilled their duty to warn. *Papas II*, 985 F.2d at 519.

In *Papas II*, as in the present case, the plaintiffs argued that the pesticides in question were "misbranded" and that they were not establishing a requirement other than that mandated by FIFRA. *Id.* at 518–19. The court in *Papas II* rejected this argument. This Court rejects it as well. Enabling a jury to decide the Wrights' labeling claims would be tantamount to a state labeling requirement, and hence is precluded by FIFRA.

Plaintiffs assert that Tennessee law does not impose labeling requirements which are "in addition to" or "different from" those required under FIFRA. Rather, Tennessee law merely mandates the same requirements. Consequently, according to this argument, allowing the labeling claims to survive would not conflict with Congressional intent.

Under its review of FIFRA and the Tennessee Products Liability Act of 1978, this Court reaches a different conclusion. The Tennessee Products Liability Act does not speak to the issue of labeling. Thus, it is unclear upon what legal authority plaintiffs rely when they assert that labeling requirements under Tennessee law are the same as those under FIFRA. If there is no labeling requirement under Tennessee law, then a jury-imposed duty would constitute additional regulation, which FIFRA explicitly prohibits.

### 2. Non-labeling Claims

The plaintiffs' non-labeling claims survive the defendants' motions for summary judgment. Even federal appellate courts that have found that FIFRA preempts failure to warn claims, have not held that FIFRA also preempts design defect and negligence claims. *Arkansas–Platte I*, 959 F.2d at 164; *Arkansas–Platte II*, —— U.S. ——, 113 S.Ct. 314; *Papas I*, 926 F.2d at 1026. The court in *Papas II*, however, held that FIFRA preempted a claim of breach of implied merchantability. *Id.* at 520. In § 136v(b), Congress identified the preemptive scope of FIFRA and limited preclusion to labeling claims. "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, —— U.S. ——, 112 S.Ct. at 2612. A plain reading of § 136v(b) reveals Congressional intent to preempt only those damage actions that arise from labeling claims.

In *Cipollone*, the Court analyzed each of the petitioner's claims as to whether the 1969 Cigarette Act preempted it. "Fairly" and "narrowly" constructing the relevant preemption clause, the Court found that the federal statute preempted some common-law actions and not others. *Id.* at ——, 112 S.Ct. at 2621. These determinations relied on whether the particular claim was based on a legal duty which constituted a state requirement or a prohibition preempted by the federal statute. *Id.* This Court must analyze the plaintiffs' claims for breach of implied warranty of merchantability, defective design, and failure to properly test and study the products within this framework.

Under Tennessee law, implicit in a sale of goods by a merchant is a warranty that the product is suitable for the purpose for which it is sold. Tenn.Code Ann. § 47–2–314(2)(c) (1992)[3]. The duty underlying the

---

**3.** Tennessee Code Annotated Section 47–2–314(2)(c) provides:

implied warranty of merchantability arises from the sale itself, not from a state labeling regulation. 3 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* 103 (3d ed. 1983). Notwithstanding Tennessee Code Annotated Section 47–2–314(2)(e), which specifically mentions labeling as an aspect of merchantability,[4] compliance with the implied warranty of merchantability does not create a labeling requirement different from or in addition to those mandated by FIFRA.

As to the plaintiffs, defendant Southern Mill Creek Products Company ("Southern Mill") has not disclaimed the implied warranty. Southern Mill argues that pursuant to Tennessee Code Annotated Section 47–2–316(2),[5] its product labels explicitly and conspicuously disclaim any implied warranties of merchantability.[6] Consequently, Southern Mill concludes that there is no genuine issue of material fact and the claim for breach of warranty must be dismissed.

■■■ This Court disagrees with Southern Mill's reasoning. It is arguable that Southern Mill disclaimed all implied warranties as to the pesticide users who saw its product labels. Plaintiffs, however, were the ultimate consumers of Southern Mill's pesticides and never saw the product labels. Thus, with respect to the plaintiffs, the implied warranty of merchantability could not be and was not disclaimed. The plaintiffs' claim for breach of implied warranty of merchantability survives.

This Court takes exception to the reasoning of the Eleventh Circuit Court of Appeals in *Papas II*. *Papas II* concluded that FIFRA preempted the plaintiffs' claim for breach of implied warranty of merchantability because the claim was based on an obligation imposed by state law. *Id.* at 520. In the case at bar, as in *Papas II*, the implied warranty of merchantability is codified in state law. Tenn.Code Ann. § 47–2–314(2)(c) (1992). Consequently, fulfillment of the warranty is a state imposed requirement. This fact, however, does not render the claim precluded by FIFRA, as *Papas II* found. Not all state imposed requirements are preempted by FIFRA, rather, only those state requirements related to labeling. 7 U.S.C. § 136v(b).

The plaintiffs' remaining claims for defective design and failure to properly test and study the pesticides in question, by definition, are not based on labeling. FIFRA did not contemplate preclusion of non-labeling claims and thus, FIFRA does not preempt these claims. Furthermore, with respect to these claims, genuine issues of material fact remain.

## IV. CONCLUSION

In entering a judgment for defendants Dow Chemical U.S.A, Dow Chemical Company, Whitmire Research Laboratories, Southern Mill Creek Products Company, and Nor–Am Chemical Company, the Court finds that a reasonable jury would be unable to return a verdict for the non-moving parties on their labeling claims. Because the record taken as a whole could not lead a rational trier of fact to find for the non-moving parties on the claims for failure to warn and defective marketing, on these causes of action there are no genuine issues for trial. *Street v. J.C. Brad-*

(2) Goods to be merchantable must be at least such as: ... (c) are fit for the ordinary purposes for which such goods are used; ...

4. Tennessee Code Section 47–2–314(2)(e) provides:

(2) Goods to be merchantable must be at least such as: ... (e) are adequately contained, packaged, and labeled as the agreement may require; ...

5. Tennessee Code Annotated Section 47–2–316(2) provides, in part:

[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, ...

6. The labels on Defendant Southern Mill's products include the following disclaimer:

DISCLAIMER: SMCP warrants that this product conforms to the chemical description on the label and is reasonably fit for the specific purposes referred to in the Directions for Use, subject to inherent risks referred to above. SMCP makes no other express or implied warranty of fitness or merchantability nor any other express or implied warranty. In no case shall SMCP be liable for consequential, special, or indirect damages resulting from the use, handling or application of this product.

*ford & Co.,* 886 F.2d at 1478. Genuine issues of material fact remain regarding the plaintiffs' other claims, and hence the claims for defective design, breach of implied warranty of merchantability, and failure to properly test and study the pesticides are not dismissed.

For the reasons set forth above, the Court grants defendants' motions for summary judgment in part. An Order consistent with the foregoing reasoning will be entered contemporaneously with this Memorandum.

### *ORDER*

Pending before the Court in the above-styled case are Defendants' Motions for Summary Judgment (Doc. Nos. 18, 21, 22, 23).

In accordance with the reasoning set forth in the contemporaneously entered Memorandum, the Court hereby GRANTS the Motions in part, and DISMISSES plaintiffs' claims for defective marketing and failure to warn.